Good morning, Your Honors, and may it please the Court, James Cobb for Plaintiffs' Wade Park Land and Wade Park Land Holdings. This appeal raises quite a few issues, and subject, of course, to Your Honor's preferences, I intended to devote my time today to the plaintiff's claims for avoidable transfers under the Bankruptcy Code and Georgia law, which the plaintiffs have brought as debtors in possession of the bankruptcy estate for the protection of the creditors. The District Court dismissed those claims, holding that the plaintiffs have not plausibly alleged a fair market value of Wade Park that significantly exceeds the $140 million in change of debt on the property. These are the estimates. I'm sorry? You're focusing on the estimates. The appraisals. Yes, Your Honor. The appraisals are the two who were sent in. That's exactly right. And the District Court They found that they were controversy, unsupported, and unreliable for a variety of reasons. Perhaps you could address that. Absolutely. That aspect Why were they unreliable? They were reliable for Apart from being Gipsy Dixons. Your Honor, the appraisals were reliable because they are contemporaneous professional opinions about the value, the fair market value of that piece of property. And under two So, contemporaneously, and the fact that it's done by a professional makes them reliable. For pleading purposes, under two decisions from this Court, the Mandela v. NTT decision and the John v. Whole Foods decision. Those two cases deal with and stand for the proposition that a plaintiff may allege a fact in the complaint by relying on a professional contemporaneous opinion and that on a motion to dismiss, the District Court has to accept the conclusion in the opinion as true. If the Court reviews the Mandela decision in particular, it's very revealing. The District Court in that case, and it's a Western District of New York decision, And I would encourage the Court to review the complaint in Mandela. It's available in the docket, case number 618-06591. What you will see is the plaintiff in Mandela relied on expert statistical studies to plead an element of her claim and alleged two facts about those studies. First, who did the studies? And second, what the conclusions of the studies were. That's it. And in that complaint, was there also allegations about actual market transactions about the property or whatever, whatever was the subject of the transfer at issue? Because here, what the District Court did was assess the entire complaint and all of the allegations, including the two actual market transactions, which were communicated by this Doppel Affidavit, where your client, I think, submitted a sworn affidavit as to the value that he was giving up in transferring the deeds, as well as the buyback agreement, which also was an actual market transaction. The District Court did consider those allegations, along with other allegations about these plaintiff's efforts, which were ultimately unsuccessful to obtain a refinancing loan that could be used to pay off the loan held by the defendants. But that aspect of the District Court's decision was wrong for a different reason. This Court's decision in Lynch v. City of New York on a motion to dismiss prohibits the District Court when faced with two plausible inferences that could be drawn from the same set of facts. The District Court can't choose between those inferences. And that's if they're both plausible, but the District Court seemed to not think it was plausible. I guess I — let me just — let's just ask whether he's right. So even before you have the later transactions, you get the bridge loan in January 2017, right? That's correct. You wanted a loan of $196 million, but Gamma would only give $83 million, right? That's correct. At that time, the property was encumbered just with the bridge capital loan and the band cap loan for $45 million and $48 million. So the Sage appraisal, which is dated November 2016, says that the property actually was worth $466.8 million, which is far in excess of the degree to which it was encumbered. Now, if that was true, why wouldn't anybody give you a bridge loan of more than $83 million? There are extensive allegations in the complaints, Your Honor, about the course of negotiations that led to this bridge loan and a decision by these borrowers, by the debtors, that in the end, given the time and sensitivity presented by the band cap loan, going with these defendants for purposes of their bridge loan was the right decision. So you're saying actually there was a wide array of lenders that would have provided the loan, but you were just, you started looking too late and you were crunched for time? No, well, the plaintiffs have alleged that throughout this period of time, they pursued a wide variety of refinancing options, all of which, and this is an important fact. Okay, so is it really, I mean, if the district court is looking at these facts and says you're telling me that the property was worth $466.8 million and encumbered only to about $80 million, and it's just implausible that it's worth that much money and you couldn't obtain a loan of more than $83 million, and this is before GAMMA has given you a loan at all. So all of the interference you allege that GAMMA made with respect to other creditors, I mean, at that point, it wouldn't have been doing that, right? Well, let's take a step back and just examine that reasoning. That is the district court's basic reasoning. But it required the district court to dive into a very detailed set of facts in that age in detailed fact-finding, the Daubert-type analysis, that looked to, and just to be clear, the district court did this with the second appraisal, the BBG appraisal. And if the court looks to the overall timeline, and I want to come back to the Mandela and John v. Whole Foods decisions, it is settled law in this circuit that a plaintiff can rely on a contemporaneous professional opinion to allege a fact in the complaint. That proposition is so That might be one of those conflicting allegations in the complaint. The district judge is required to look at the entirety of the complaint. I don't disagree with that, Judge Walker, but there are not conflicting allegations. These plaintiffs, just to be clear, did not allege that they were unable to obtain a refinancing loan because the property was not worth $140 million. They allege that there were other reasons. They were ultimately unsuccessful. And we laid those out for the district court on a motion to dismiss. I understand, but that's why I'm asking about the initial bridge loan, because I understand it's the leader inability to obtain a loan. You said that there was this interference. But at the very outset, in January 2017, all you could get is a bridge loan of $83 million. And why would that be the case if the property was actually worth $466.8 million? We have not engaged in discovery. Those are questions that I would like to ask the defendants in the course of discovery. So you're saying, before GAMA provided the bridge loan, it was somehow preventing other plaintiffs from coming in to provide financing? Absolutely not. And there are allegations that – So what would come up in discovery that would explain why you couldn't get financing at that point in January 2017? In this circuit, the test for reasonably equivalent value is objective. It is a fair market value test. It's not based on what the defendants valued the property at or what the plaintiffs valued the property at. And the whole purpose of that analysis is because this is a bankruptcy claim intended to protect creditors, who can only be protected if an asset comes into the estate that could be used for administering it. So this Court, going back to most recently the Tribune decision, made very clear that the test for fair market value is objective. It doesn't look to what the defendants valued the property as. It doesn't look to what the plaintiffs – Well, I'm not making a subjective argument. I'm just saying, if it was objective, there would have been somebody in the market that would have provided more financing. And you're saying – And there are – You're looking in lots of different places. And – There are allegations – You couldn't even get a loan of more than $83 million alone. I apologize for interrupting, Your Honor. Yes. Go ahead. There are explicit allegations in the complaint about interest from other lenders at a value well in excess of $140 million. For example, there is an allegation about a term sheet – I'm sorry. You're talking about the time of the debt in lieu of foreclosure? And that's the relevant – That's the relevant time period for the fraudulent transfer. Yeah. No, I understand. But since I'm evaluating the appraisal, since the Sage appraisal is November 2016, I'm saying in January 2017, you couldn't even get a loan of more than $83 million. But there is a second appraisal from about four months prior to the transfer at the end of 2018 that placed a value of the property – Okay. So can I just – So you're saying we should discount the Sage appraisal, but credit the later one? Well, under Tribune, the Court needs to consider the totality of the circumstances. And our argument, Your Honor, is that both of these appraisals, plus a third allegation, are part of the totality of the circumstances. The first is the Sage appraisal from about two years prior to the transfer. The second is the BBG appraisal from about four months prior to the transfer. And the third allegation, which the district court discounted for a reason that is still a bit confusing to me, is that between those two periods of time, about $70 million in improvements were made to the property. It's a reasonable inference that that $70 million alone partially explains the increase in value.  Well, I don't know. It's true that both appraisals put a lot of value on the improvements. But, you know, did the improvements actually turn out to have any value? Didn't subsequent developers regard them as costly? There's nothing in the complaint to that effect. That's a point the defendants have made. But I will note in the record of the construction loan agreement, Section 2.2, it requires that the defendants approve every single improvement to this property. That's in the contract. It's a standard term of the construction loan agreement. So the idea that adding $70 million in improvements that the defendants must have approved under the contract would somehow reduce the value of the property, that's an adverse inference that under Lynch, under Twombly, simply can't be drawn. The other thing about the appraisals is that they talk about, they evaluate what the value would be on an open market transaction with no constraints on the sale. But since the alternative to the debt and lewis foreclosure agreement would have been a distressed sale, shouldn't those be the conditions under which we evaluate the value of the property? Not under Tribune. Not under the Supreme Court's decision in BFP v. Resolution Trust Court. This court has to consider a fair market value determination. And what is fair market value? It is a fair market value, but it would be whatever the market would ascribe, whatever they would ascribe the value to be under the conditions under which it would actually be sold, which is a distressed sale. Fair market value, Your Honor, it turns on a hypothetical buyer, a hypothetical seller, neither of whom is acting under compulsion to buy or sell, who are negotiating at arm's length, and both of whom have access to reasonably equivalent information. But isn't fair market value determined based on a benchmark? And the actual benchmarks that exist here are the buyback agreement and the amount identified for the debt relief in the DIL agreement, right? Those are the two actual market points that the record shows. So you're arguing for a totality of circumstances, but you're not taking into consideration those specific market facts. I'll note, and I apologize for interrupting, Your Honor. I'll note two points about those two agreements. First, they are not alleged to be arm's length transactions. These plaintiffs are affiliated with these defendants through common ownership of Wade Park Ventures. This is not an arm's length transaction. There are also allegations in the complaint about the defendants' bad faith. And it would be, frankly, a remarkable development in the law of fraudulent transfer if the terms negotiated between affiliated parties in the agreement itself that is sought to be undone could trump objective evidence of fair market value, hypothetical buyers and sellers. But there's no requirement in Tribune. But Tribune doesn't say that if the two parties to this claim are actually involved in the only actual market transactions at play here, that somehow you discount those factors when assessing reasonably equivalent value. Tribune doesn't say that. It says totality of the circumstances. But there's another decision from this Court I'd like to make sure you're aware of, Roblin Industries from 1996. Roblin Industries says this, whenever possible, and this is specific to a fraudulent transfer claim, whenever possible, a plaintiff should rely on seasonable appraisals to prove value. This happens in fraudulent transfer claims all over this country. Appraisals are used in real estate lending transactions every day. But this Court has said seasonable appraisals, meaning historic, contemporaneous appraisals from the season at issue in the transaction, should be used, quote, whenever possible. So it would be a change in the law in this circuit if the Court were to conclude that an allegation with sufficient information to require the district court to accept the conclusion in the appraisal as true can be disregarded on a motion to dismiss based on adverse inferences drawn by the district court. I have two more basic questions. So if in February 2019, instead of entering into the debt in lieu of foreclosure agreement, GAMMA just foreclosed on the property, that would not have been a fraudulent transfer. It would not under BFP versus resolution. So the fact that GAMMA provided this accommodation to Wade Park to prevent foreclosure and to leave in place the possibility of retaining the property, that led it to become a fraudulent transfer that could be invalidated? Yes, and under the law of Section 548, one thing the Court should keep in mind, this is not Stan Thomas or Wade Parkland and Wade Parkland Holdings trying to get property back from defendants. This is a group of creditors trying to bring property back into the bankruptcy estate. Yeah, so did Wade Park have a bunch of unsecured creditors that could be prejudiced by the transfer? Yes, Your Honor. And how many of those are related to Mr. Thomas? The majority of them are not, considered insiders. The majority are not? And the Court could review the docket in the bankruptcy court. There are insider creditors, but if you count the number of creditors, the majority are not. And frankly, if this claim were to be successful, Your Honors, the defendants would become the single largest creditor of the estate, and they would be at the front of the line, secure creditors. With an orderly estate administration, they should be adequately protected. That's an important point when you're thinking about this as a fraudulent transfer claim compared to a traditionally private fraudulent transfer claim. I've gone over my time. I appreciate it. Thank you very much, Mr. Cobb. We're near time for rebuttal, so we'll hear from you again. But let's turn to the appellee, Mr. Dill. Yeah. Thank you, Your Honor. Your Honor, Judge Lyman correctly held that the plaintiffs don't plausibly allege that they received less than reasonably equivalent value. The only allegations in their complaint, in their second amended complaint, which is their third complaint, about this are paragraph 327, where they say the following, in a report issued January 2, 2019, independent appraiser BBG appraised the as-is value of the Wade Park properties as of October 18 at $565 million. And at paragraph 338, they say in November 2016, the Gamma defendants obtained an independent appraisal from Sage Group of the as-is market value of the properties. Sage Group appraised it at $466. Your Honor, in a 134-page complaint, this is all there is. These are completely conclusory allegations. There's no allegations of fact as to how or why these so-called appraisers were independent. There's no allegations about how they arrived at their conclusions. There's a two-page letter attached as Exhibit A to the complaint, which says the district court ---- So you're saying that even apart from the notion that, you know, the district court relied on, which is that it wasn't plausible that the properties had that value, you're saying just because the complaint doesn't allege the methodology and how they arrived at that value, that it's conclusory and it can be dismissed anyway? That's right, Your Honor. It's completely conclusory. If you look at the letter they attach, it says the report ---- So we had no record of market transactions. If the only thing in the complaint about the value of the property were the appraisals, you're saying it should still be discounted? Your Honor, no. What I'm saying is, yes, that's right. The appraisals ---- the allegations about the appraisals are completely conclusory. In fact, they attach a letter from none of the appraisals. So why don't you just say that, you know, the appraisal or the report or something is integral to the complaint and maybe it could be looked at in evaluating the motion to dismiss? Well, they've actually agreed, Your Honor, in their briefs that they're not relying on ---- they're not saying that Judge Lyman did anything wrong in not considering ---- not looking at the actual BBG appraisal, which they decided not to attach to their  They're not saying that Judge Lyman did anything wrong in having several opportunities in not looking at it and making his decision. Your Honor, he didn't need to look at it. They didn't attach it. And they didn't provide any basis. Their allegations about it are completely conclusory. That's even before you get to the fact that they're totally implausible. But we have an allegation that there are these professional firms that conducted these appraisals. Isn't that at least some piece of evidence? No, it isn't. But that's the whole point, Your Honor. If you look at it, you'll see if you ---- one thing they did attach on BBG was this report was prepared for Churchill Commercial Capital client and their successes and assigns, and it's intended only for its specific use. And then it says the appraisal report that follows sets forth assumptions, limiting conditions, and reasoning leading to the conclusions, which they don't  It's not before the Court. There's nothing about who these people are or what they are. This is simply a simple allegation. Now, when you combine that with everything else that they have in their complaint, which makes it clear that long before they ever came to Gamma for a four-month bridge loan, because no one else would lend them any money, they had tried to find sources of financing, and they couldn't find it. And then for two years, there's a four-month bridge loan. The very first extension they were supposed to get, they didn't qualify for. There had to be a modification of the construction loan agreement in order for them to continue, which Gamma agreed to. This four-month loan stretched to two years, Your Honor. And during that time, they were unable to come up with any other financing at all. Then what happens is in early ---- Well, Your Honor, take a look at their interference allegations, because they're really ---- they really don't say anything. Actually, if you look at the heading in their reply brief, heading 1I, Roman number 1A2, it says Gamma's interference could explain. It doesn't say it does. Could explain the lack of refinancing. Then look at ---- No. No. No. I mean, as long as it's plausible. But it doesn't ---- It could. It has to be plausibly could, but assuming that that's implied in the word could, isn't that the state of the art to meet on a motion of dismissal? Yeah. But, Judge Manasci, if you then look at what the allegations are, the allegations of interference are that Mr. Calico allegedly yelled at a Bluebell principal in a  first thing to think about it is, that's at the very end of 2018, the beginning of 2019, after four years of looking for other financing. So he yells at them. Neither can explain their ability to obtain financing for the prior four years, and neither can explain their ability to obtain financing then. Well, why wouldn't the inference be that if they have these allegations of this kind of extraordinary interference with the intent to obtain credit, and they have specific allegations about some instances, it suggests that there was a more extensive effort to prevent them from obtaining credit? There's no ---- But that's not, in fact, what happens. The allegations are that he yelled, and the allegations are ---- There's no allegation that that caused ---- And then he yelled at these potential creditors also because he bought up the debt on some of the other properties to prevent Wade Park from extracting value from them. Right? That doesn't ---- First of all, those allegations separately, they're not even at issue anymore. That was dismissed for failure to state a claim. And they haven't even appealed that, that dismissal of that, one of their 18 counts. But secondly, Your Honor, that has nothing to do with the ---- But isn't it also some fact that might explain the inability to obtain credit? No. Because how does that affect ---- To pay back the loan, I guess. Yeah. How does that affect whether J.P. Morgan will give them a loan or whether someone ---- That doesn't go to whether the creditors might be available, but it does go to whether they would be able to repay the loan. Yeah. It doesn't go to anything. That's the point. There's no real interference alleged here. So what is your best argument in response to what your adversary just articulated, that the buyback agreement and the deed and loan agreement, the amount of debt relief in the DIL and that the $150 million buyback price are not evidence of fair market value? Well, I mean, that's an ---- It absolutely is incorrect, Your Honor. The buyback loan, if you look at the buyback, to start with that, at $150 million, after my clients had received back the property, owned the property, had no obligation to sell it at all, they could have walked away and done anything they wanted with it. They entered into an agreement to sell it back to them for $150 million. How could that possibly be consistent with any notion? Their position is that those two transactions were not negotiated at arm's length and that there were allegations of bad faith. What's your response to that? Well, Your Honor, it says in the agreement itself, the deed and loan agreement itself, has language that makes it clear that it wasn't in bad faith, it was in good faith, that there was nothing wrong. There was no inducement, no fraudulent inducement. They were represented by counsel. There was not ---- there's absolutely, Your Honor, no pleading that would satisfy ---- no plausible pleading that would in any way suggest that there was any bad faith here. They had an alternative. My client had already started the foreclosure. It's ---- that's spelled out in the deed and loan agreement and in the forbearance agreements, that they were in default, that foreclosure proceedings had started, and that they ---- that my client had said, okay, we'll give ---- first we'll give you more forbearance, and then in the deed and loan agreement ---- Yes, but I wanted to ask that question. So if the foreclosure had occurred, no one would say that that's a fraudulent transfer, to foreclose on the property, right? That's right, Your Honor. And they gave them another opportunity.  Yes, many accommodations, Your Honor. So is it a problem that that would then transform into a fraudulent conveyance? I agree with you. I think it would be a problem. It's absolutely ---- And maybe that problem is resolved if we rely on the presumption that transfer in satisfaction of antecedent debt actually is, you know, assumed to be a reasonably equivalent value. Do you think the district court was wrong to say that that didn't apply in this case? Well, Your Honor, we actually argued to the contrary. That was one area where Judge Lyman disagreed with us. And so, yes, I think it is. I mean, that's why the allegations are so completely implausible. If they thought the thing was worth $550 million, and remember, that appraisal that they got, the BBG appraisal, was virtually contemporaneous with the deed and lieu agreement. If they thought that, they could have let it go into foreclosure. If they could sell it for more than $140 million, if that's what the number was, then they could benefit from that. But obviously they didn't think so. They decided to enter into the deed and lieu agreement. They had every opportunity to do what they wanted to, and then they didn't comply with the deed and lieu agreement. And so every indicia shows that it's not plausible to allege that there was. So I asked Mr. Cobb about unsecured creditors of Wake Park, and he said that the majority of them are not related to or not related parties. Is that right? Your Honor, I can't tell you because we don't know all the related parties here. So I don't have the answer to that. What I can tell you is if you look at the plaintiffs here, it's not just the two Wade Park entities. It's the Thomas Family Trust that is basically bringing and paying for this proceeding, and that's what's going on here, Your Honor. That's what this case is about. It's about Thomas. It's not about anyone else. As he points out, we are the biggest creditor, except, you know, had we not had they gone into bankruptcy and we had not received back the property, we'd be the biggest creditor. If for some reason they got the property back, we'd be the biggest creditor. That's what this is about. This is Thomas taking a shot. You heard in the earlier argument throwing all the spaghetti against the wall. That's exactly what's happened here, an 18-count complaint trying every single possible claim, and none of them work, Your Honor, because there is no claim. Because this lender actually extended itself over and over and over again to give them opportunities. Six forbearance agreements, then a deed-in-lieu agreement, then a buyback agreement. My clients are lenders. They were not developers here to develop the property. But according to the allegations that actually, you know, Mr. Calico called up possible creditors and yelled at them and so on, might you not conclude that the inference is that he was not just trying to help them but has a separate agenda? Judgment. Actually, there was no reason why those two possible lenders at the very end of this period even needed to talk to Mr. Calico, because if they were interested in lending the money to pay back these loans, they could simply have done that without ever talking to anyone from my clients. The reason that they would want to why would they want to talk to someone from my clients? To get a concession, to get a reduction. And my clients had no obligation to give them a reduction. If they wanted to pay back the loan, they could have paid my clients back. My client would have been perfectly happy. They could have taken out their own loan. And that would have been great. We wouldn't have had to deal with, for example, this three or four years of litigation that we've already been through with one complaint after another. I think the appropriate benchmark would be a distress sale, Your Honor. But in fact, they simply couldn't get any price. No one was prepared to put up this money. And if you look at the appraisals, they're completely inconsistent. That also shows you, once you get into the appraisals, you see that three out of the five factors that they looked at were simply handed to them by Thomas. They said, we got these numbers from the developer. We got the lease value from the developer. We got the cost number from the developer. We got the tax number from the developer. And if you look, Your Honor, at the cost number, in other words, the amount of costs that Thomas claimed he put in, what he told Sage was twice the number that he told BBG two years later. So in other words, the amount he had put in mysteriously was cut in half over those two years. And the other two factors were the land. The land, actually, if you look at the main land, the appraisal number is about $100 million. And then for the excess land, miraculously, for excess land, they claim that's worth $200 million to hike up the appraisal. That's why you didn't need to look at the appraisals, because they weren't attached. But even if you look at them, they simply undermine their case, which is why I assume they didn't attach them, because they knew they were inconsistent and totally implausible. And so there was – so attaching them would only hurt their claim and hurt their ability to state a claim. So they didn't attach them. And then they – And the appraisals were somehow sponsored by Thomas or Thomas-related entities. Isn't that right? Yes. Thomas ordered the first one. He alleged in his complaint that my clients did. But when you actually look at it, you see it was him who did it. And then the second one, obviously, miraculously, and they were all getting their numbers from him. What kind of an independent appraisal is that? They say these people are independent. They're totally not independent. So, Your Honor, there's no basis for this claim. There never has been during this entire three years of litigation, unless you have other questions. I'll say – oh, I'll say one more thing, which is that case that they cited, the Mandela case, that doesn't help them at all. I mean, it supports dismissal here. The Court affirmed dismissal because the plaintiffs couldn't rely on conclusory statistical inferences. That was an employment discrimination case alleging disparate impact. It has nothing whatsoever to do with this case. So, Your Honor, we – I don't think he was citing it for the proposition that expert reports and analysis is just a valid thing for a complainant to rely on in a complaint. If you had a – I think, you know, you were saying originally that we should just discount the report because the reference of the complaint is conclusory. But you do have an argument that even if it is a point in their favor or a fact, that it's rendered implausible by the rest of the allegations. Yes. And the district court only looked at the BBG appraisal in order to deny leave to amend, right? The district court was not looking at the appraisal to dismiss. That's right. And if I could say, the Court did that sua sponte.  There's no basis whatsoever to grant leave to amend. And, in fact, I think this Court has said that it's frivolous to ask for leave to replead when you – or to appeal on that basis when you haven't even – here it is. In the Hiroshiko case, in this Court, Hiroshiko against Citibank, the contention that the district court abuses discretion in not permitting an amendment that was never requested is frivolous. Your Honor, they didn't ask for leave to amend. And the Court, for some reason, Judge Lyman sua sponte considered it anyway. And he found it was wrong. There's no basis for an argument there. And for a very quick follow-up, the deed in lieu agreement and the six forbearance agreements, are those incorporated by reference in the complaint? They are, Your Honor. Yes. Thank you. Yes. And they're attached. And so they're in front of you. You have them if you want to look at them. Thank you. Thank you. Thank you very much, Mr. Dell. We'll turn back to Mr. Cobb. I would just like to make a handful of points. First, in response to Judge Menaschi, your question about a transfer and satisfaction of an antecedent debt, that was an issue briefed in the district court that the district court ultimately agreed with us on. It has not been briefed on appeal. But I'll just note that every case that we relied on that was briefed in the district court involving a transfer and satisfaction of an antecedent debt being kind of per se reasonably equivalent value involved a dollar-for-dollar satisfaction. It was the contrary. Well, if you have a dollar-for-dollar satisfaction, why would you need a presumption that it's reasonably equivalent value? That means the presumption doesn't really exist. I agree with you on that. So you think the presumption does not exist? I do, under New York law. And if you're going to review the briefing in the district court. So what do we do with the treatises and the judicial opinions that say there is such a presumption? Well, it can be cabined to a dollar or a fungible asset, something that has a fixed value. Real estate is the classic non-fungible asset. You're saying it should be cabined to cases where it doesn't do any work. I think every case that I've ever read involving that issue is, in fact, involving a fungible asset, something that has a fixed value, not real estate, the opposite of a fungible asset. Two, Judge Chaudhry, you asked some questions about the estoppel certificate and the buyback agreement. I want to make a point about the statutory text here. Section 548 of the Bankruptcy Code allows a claim like this to be brought if a debtor either voluntarily or involuntarily accepts less than reasonably equivalent value. The voluntarily language there is very important. It suggests that even if a debtor decides, I'm going to take less than reasonably equivalent value, I'm going to act irrationally, the trustee of the bankruptcy or here the debtor in possession still can bring a claim to set aside that transfer. Third, on the interference issue – The trustee here didn't do it, right? I'm sorry? The trustee here didn't bring that claim. The trustee is – the debtors are acting as debtors in possession, and no one has asked for a trustee to be – no one has suggested that debtors in possession are not doing a good job. But the debtors in possession stay in the shoes of, like, a trustee. Yes. They are acting as a trustee. On the interference issue, it is not just that the defendants called and yelled at these lenders. The defendants refused to consent to a refinancing loan. And I understand their argument that there was no consent required. That's just counter to the contract. Section 8.2 of the construction loan agreement says that borrower, Wade Parkland and Wade Parkland Holdings, shall not incur indebtedness without the defendant's consent. It's a flat bar. And these guys didn't have $140 million in cash to pay off this loan. They had to get a loan to do that. That explains why Mr. Calico and the GAMA defendants were having communications with these lenders, not concessions. There's no concessions alleged in the complaint. The last point I'd like to make, I would encourage this Court to review the Mandela decision, and not just the panel's opinion. Review the subsequent order denying a petition for rehearing on FONC. What you will see in that, unusually, is a series of dissenting and concurring opinions that disagree about a whole host of issues, but all agree on one fundamental point. An expert opinion, contemporaneous with the transaction at issue, has to be accepted as true on a motion to dismiss. And if you combine that conclusion with the allegations in the complaint from Mandela, where none of the details Mr. Dell just went through were included. It was just, here's the conclusion and here's a citation to the study. Go figure it out for yourself. Ten judges on this Court concluded that was enough to require that the District Court accept as true the conclusions in those appraisals. When you combine that with the interference allegations, in the end, the District Court just improperly weighed completing plausible inferences. There is an explanation for why every refinancing loan that these plaintiffs pursued was ultimately unsuccessful, and those explanations have nothing to do with the fair market value of Wade Park. And is it your position that the District Court should have just ignored the $150 million buyback agreement and the debt relief given in the Deed and Loan agreement? No. What was the District Court supposed to do with those allegations? Well, there are plausible inferences to be drawn that have nothing to do with fair market value. Just take the buyback agreement and the estoppel certificate. At the time that those were executed, the Deed and Loot and the, I'm sorry, I want to focus on the buyback agreement. As between the estoppel certificate and the buyback agreement, there is a five-day difference between those two documents. And I understand that the defendants are saying this was not a fraudulent scheme. My clients obviously disagree with that and have come to the conclusion that everything these defendants did was designed to maximize the likelihood that this loan wouldn't be repaid. And if you view this through that lens, then a five-day period between the defendants presenting these plaintiffs with an estoppel certificate that swears under oath the plaintiff, not my clients, a different entity, that incorporates that $150 million term, of course they'd want those numbers to be the same. Because there's not going to be a change in value over a five-day period between March 30th and April 6th or whatever the dates were. But your client didn't need to accept the buyback agreement, right? Your client didn't need to sign that agreement? No, but we have allegations in the complaint about the importance of this development to Wade Parkland and Wade Parkland Holdings. And again, on a motion to dismiss, the defendant, the plaintiffs here do not have to act rationally. I mean, the entire premise of a fraudulent transfer claim under the constructive fraud scenario is that the plaintiffs acted unreasonably. I'm sorry, the defendants acted unreasonably. Because you are we have to prove that the transfer here was not for reasonably equivalent value. And there's a lot of discussion in the papers and in the district court's order about economic rationality. There's not a single case that I'm aware of anywhere in the country that imports an economic rationality element into a fraudulent transfer. Right, so you're saying that actually the deed in lieu of foreclosure agreement was irrational for them to enter? If it was irrational, that doesn't make sense. Was it irrational? I mean, if they're betting on the property having a high value and so they would get to pay off the loan and then retain the property instead of putting it into foreclosure, wouldn't that be irrational? That is my client's theory. That's the reason that these plaintiffs have alleged that they agreed to the deed. Yeah, but that's true. And so what they're getting is a chance to retain the property, which they expect to have a very large value. And what they're exchanging that for the possibility that Gamma will get a windfall in terms of a very valuable property if they don't pay back the loan. Doesn't that itself show reasonably equivalent value? Then we have to value what it meant to your client to be able to have this chance to retain the property and make the profit that it expected. I'll just leave you with this one thought in response to that question. And this dovetails with your earlier question, Your Honor, about a distressed sale versus a traditional fair market value analysis. Those are all factual issues. There is no allegation in this complaint that this was a distressed sale scenario. In fact, there's not a single allegation about any effort to market these properties at all. So I don't know what basis a district court would have. I'm sorry, but the deed in lieu of foreclosure agreement is in lieu of foreclosure, right? The alternative would have been a foreclosure sale, right? That's right. So wouldn't that mean that it would have been a distressed sale? But not when you give credit. Isn't the complaint that Gamma started advertising the property after that? Well before the deed in lieu of foreclosure. That's one of the allegations of interference is that those advertisements made it more difficult for these plans to obtain refinancing. They were doing it pursuant to the terms of the agreement. We're not saying it was improper under the contract for them to engage in the advertisements, but all we have to do on a motion to dismiss is give a plausible explanation. It doesn't even have to be equally plausible. Under Lynch v. City of New York, it just has to be plausible. And once we have a plausible explanation for these plaintiffs' apparent inability to obtain a refinance that has nothing to do with fair market value, under Lynch, the plaintiffs should win and this court should reverse and remand for further proceedings.